# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DAVID A. GAMBINO,

     Plaintiff,

     v.

FRANK HERSHBERGER,
SHANE SHEETZ,
KRISTI CRITES,
DR. MOUBAREK,
BRETT DODD,
LIEUTENANT EIRICH,
C. TODD,
WARDEN STEWART,
COUNSELOR SMITH,
JANE DOE, *Assistant Warden,*
4 JANE DOE MEDICAL PROVIDERS
AT FCI CUMBERLAND,
8 JOHN DOE OFFICERS AT FCI
CUMBERLAND, MD,
JOHN DOE, *Representative for Mid Atlantic*
OFFICE OF BOP,
JOHN DOE, *Representative for BOP,*
CAROL MILLER,
TOM GERA,
JODY AMERZUA,
P. BOCH,
DENISE VANMETER,
TEQUILA McGAHEE,
BLAINE SMITH and
CARRIE HANSCOM,

     Defendants.

Civil Action No. TDC-17-1701
Civil Action No. TDC-17-2311

---

## MEMORANDUM OPINION

Plaintiff David A. Gambino, a former federal inmate at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland'), has filed these consolidated civil rights actions pursuant to 42 U.S.C. § 1983 asserting various constitutional violations against him while he was

incarcerated at FCI-Cumberland from March 3, 2015 to March 7, 2016. Gambino was released from federal custody in October 2020. Pending before the Court is Defendants' Second Motion to Dismiss the Complaint, or in the Alternative, for Summary Judgment ("the Second Motion"). Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Second Motion will be GRANTED.

## BACKGROUND

The allegations in the Complaint, relevant background facts, and relevant procedural history are set forth in the Court's memorandum opinion of March 20, 2019, in which it granted Defendants' First Motion to Dismiss, or in the Alternative, for Summary Judgment ("the First Motion"). *Gambino v. Hershberger*, No. TDC-17-1701, 2019 WL 1300856, at *1-3 (D. Md. Mar. 20, 2019). The Court incorporates that memorandum opinion by reference and provides only the additional background information necessary for resolution of the Second Motion.

As a result of the Court's ruling on the First Motion, the remaining claims in these cases consist of: (1) under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), violations of the Eighth Amendment to the United States Constitution based on deliberate indifference to Gambino's serious medical and dental needs, and based on the use of excessive force against Gambino; (2) under *Bivens*, violations of the First Amendment based on retaliation against Gambino for filing grievances and based on hindering his access to the courts; (3) violations of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-80 (2018), based on alleged battery and intentional infliction of emotional distress against Gambino; and (4) violations of the Privacy Act of 1974, 5 U.S.C. § 552a (2018), for releasing certain personal information. The Court granted Defendants leave to file the Second Motion addressing these claims.

As to the Eighth Amendment, Gambino alleges several instances of alleged deliberate indifference to his medical and dental needs. He asserts that beginning on March 3, 2015, he was provided inadequate medical care for severe back pain, including his need for a cane; for a fungal infection; and for a stomach condition, including by discontinuing his prescription for Prilosec. Gambino also alleges that Defendants provided inadequate care during a hunger strike in July 2015 by turning off the water to his cell. He further alleges that he received inadequate dental care that resulted in an infected wisdom tooth.

Gambino also asserts that Defendants acted with deliberate indifference to his mental health needs. Among other things, he contends that Defendants improperly prescribed him the medication Citalopram in November 2015 and that in February 2016, Defendants failed to prevent and properly respond to several suicide attempts by Gambino and used excessive force in handling him after such attempts.

Gambino further alleges that Defendants violated the First Amendment by retaliating against him for pursuing legal actions against prison personnel, including when Defendant Lt. Eirich told him that he would likely be raped at the prison to which he would be transferred and ran his finger along the area between his buttocks. He also alleges that Defendants further retaliated against him in violation of the First Amendment by destroying certain legal materials belonging to him and releasing certain personal information about him, and that these actions also violated his First Amendment right of access to the courts. In addition to a *Bivens* claim for these alleged constitutional violations, Gambino also asserts common law tort claims of battery and intentional infliction of emotional distress under the FTCA based on this conduct.

Finally, Gambino alleges that prison officials violated the Privacy Act by releasing certain personal records to the public and thus causing him mental and emotional distress.

3

On May 21, 2020, Defendants filed the Second Motion.  On June 26, 2020, Gambino filed an 83-page memorandum of law in opposition to the Second Motion with multiple attachments. Gambino also filed several requests for discovery that he deemed necessary to permit him to oppose the Second Motion.  The Court struck Gambino's brief for violating the 35-page limit for briefs, *see* D. Md. Local R. 105.3, ordered Defendants to produce certain requested discovery, including a video recording and all of Gambino's medical, dental, and mental health records from FCI-Cumberland, and granted Gambino leave to file a conforming 35-page brief that would allow him to incorporate information obtained through the discovery materials.  After receiving multiple extensions from the Court, Gambino filed a new response to the Motion, consisting of the same 83-page brief and attachments, over one month after the latest deadline.  Although this second filing continues to violate the page limitation and the Court's prior order, in the interests of justice, the Court will accept the filing.

## DISCUSSION

Defendants seek dismissal of the remaining claims under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56.  Specifically, they argue that:  (1) certain Defendants who are commissioned personnel of the United States Public Health Service are immune from suit; (2) Gambino has failed to allege sufficient facts to support a claim of supervisory liability against Defendant Warden Stewart; (3) Gambino failed to exhaust administrative remedies on all claims other than his Eighth Amendment claims relating to medical and dental treatment and certain FTCA claims; (4)  the allegations and record evidence do not support plausible claims for violations of the Eighth or First Amendment; (5) a *Bivens* claim may not be based on an alleged violation of the First Amendment; (6) the allegations and record evidence do not support plausible FTCA claims based on common law torts; and (7) Gambino has not stated a plausible claim for relief under the Privacy Act.

4

## I.    Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment. Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

5

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). In this instance, Gambino requested certain discovery prior to the resolution of the Motion, and the Court granted several of his requests, including for the only existing video relevant to his claims. Having provided such discovery, and where Gambino has submitted his own affidavits and exhibits, the Court finds that the Second Motion may be treated as a Motion for Summary Judgment for purposes of those arguments requiring consideration of the attached exhibits, video, and other record evidence.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.     Public Health Service Officers

As a threshold matter, Defendants argue that Defendants Dr. Frank Hershberger, the Chief

Psychologist at FCI-Cumberland; Thomas Gera, a physician's assistant; and Denise VanMeter, a

registered nurse, were commissioned personnel of the United States Public Health Service ("PHS")

at the times relevant to Gambino's allegations and are thus immune from suit. By statute, in light

of the availability of FTCA claims against the United States, commissioned officers and employees

of PHS are immune from liability for damages "resulting from the performance of medical . . .

functions." 42 U.S.C. § 233(a) (2018). This provision "precludes *Bivens* actions against individual

PHS officers or employees" for harm arising from the performance of their duties. *Hui v.

Castaneda*, 559 U.S. 799, 812 (2010). Therefore, Gambino's claims against Dr. Hershberger,

Gera, and VanMeter are barred by this statutory immunity. The claims against these Defendants

will be dismissed.

## III.     Warden Stewart

Gambino has not alleged any personal misconduct by Warden Stewart. Rather, his claims

against Warden Stewart are based on his position as the overall supervisor of personnel at FCI-

Cumberland and his failure properly to supervise subordinates. "In a Bivens suit, there is no

*respondeat superior* liability. Instead, liability is personal, based upon each defendant's own

constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (citation omitted).

A plaintiff making a supervisory liability claim must therefore show "that the supervisor had actual

or constructive knowledge that [the] subordinate was engaged in conduct that posed a pervasive

and unreasonable risk of constitutional injury to citizens like the plaintiff," "that the supervisor's

response showed deliberate indifference to or tacit authorization of the alleged offensive

practices," and that there was a causal link between the supervisor's inaction and the plaintiff's

injury. *See Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014) (discussing supervisory liability under 42 U.S.C. § 1983).

Here, Gambino has not sufficiently alleged or established that Stewart personally participated in his medical, dental, or mental health treatment, the alleged misconduct relating to the response to his suicide attempts, or any of the other alleged constitutional violations by FCI-Cumberland personnel. He also has failed to allege or establish sufficient facts to show that Warden Stewart had any actual or constructive knowledge of these events. Accordingly, the Motion will be granted on the claims against Warden Stewart.

## IV.   Privacy Act

Defendants argue that Gambino's claims that the release of documents containing personal information relating to him violated the Privacy Act necessarily fail because he has neither alleged nor established any actual damages. The Privacy Act requires federal agencies to maintain records used to make determinations about individuals "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). It grants individuals certain rights to obtain access to agency records pertaining to them and to request amendments to records they believe to be inaccurate. *See id.* § 552a(d)(1), (2). It also requires federal agencies to establish appropriate safeguards to "insure the security and confidentiality of records." *Id.* § 552a(e)(10). A private citizen may bring a civil action for failure to comply with a requested amendment or to otherwise comply with Privacy Act, but such a claim must be brought against a federal agency, not an individual federal employee. *See id.* § 552a(g)(1); *see also Ramirez v. Dep't of Justice,* 594 F. Supp. 2d 58, 61-62 (D.D.C. 2009) (stating that the term "agency" under the Privacy Act does not encompass "officers or employees"); *Morris v. U.S. Prob. Servs.,* 723 F. Supp. 2d 225, 227 (D.D.C. 2010). In such a case,

a plaintiff may obtain "actual damages sustained by the individual." 5 U.S.C. § 552a(g)(4)(A).  In light of this provision, the United States Supreme Court has held that the Privacy Act waives the federal government's sovereign immunity for "actual damages," but not for mental or emotional distress damages. *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 299, 304 (2018) (holding that the term "actual damages" in the Privacy Act is "limited to proven pecuniary or economic harm," and thus does not include "mental or emotional distress").

Here, Gambino alleges, without further detail, that in October 2015, his "personal mental health records were released by [the] Mid-Atlantic [O]ffice of the Bureau of Prisons" in violation of Privacy Act.  Compl. at 2, ECF No. 1.  Although Gambino alleges that the purported unauthorized disclosure had an adverse effect on his mental health, he fails to allege that any such disclosure caused any actual damages in the form of pecuniary or economic harm.  Because sovereign immunity has not been waived for Privacy Act claims based on mental or emotional distress only, the Motion will be granted as to the Privacy Act claims.

## V.     Exhaustion of Administrative Remedies

Defendants argue that with the exception of the Eighth Amendment claims relating to medical and dental care and the FTCA claims for which Gambino exhausted the relevant administrative process, Gambino's remaining claims must be dismissed for failure to exhaust administrative remedies.    The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e, provides that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a).  This exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

9

other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It applies to *Bivens* actions alleging constitutional violations. *Id.* at 524; *see also Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust administrative remedies where the plaintiff did not appeal his administrative claim through all four stages of the Bureau of Prisons's grievance process).

Exhaustion requires that prisoners pursue a claim through all available stages in the administrative process until they receive a final denial of the claim. *Chase v. Peay*, 286 F. Supp. 523, 530 (D. Md. 2003); *Gibbs*, 986 F. Supp. at 943–44; *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming the dismissal of a prisoner's claim for failure to exhaust administrative remedies because the prisoner "never sought intermediate or full administrative review after the prison authority denied relief"). A claim that has not been exhausted may not be considered. *See Jones v. Bock*, 549 U.S. 199, 219-20 (2007).

The Federal Bureau of Prisons ("BOP") has established an Administrative Remedy Program, 28 C.F.R. §§ 542.10-542.19 (2020), for inmates to resolve grievances related to their confinement. This process consists of the following steps: (1) the inmate is first required to present the issue informally to staff, pursuant to procedures to be established by the Warden of the prison; (2) if the inmate is unable to resolve the issue informally, the inmate must file a written Administrative Remedy Request with the Warden within 20 days of the date of the incident in question; (2) if the Warden's response is unsatisfactory, the inmate must file an appeal to the BOP Regional Director within 20 days of the Warden's response; and (3) if the inmate is still not satisfied, the inmate must file an appeal to the BOP Office of General Counsel in Washington, D.C. within 30 days of the date of the Regional Director's response. 28 C.F.R. §§ 542.13-542.15. For a *Bivens* claim, the exhaustion requirement is satisfied by the completion of this process, not

by the filing of an administrative tort claim under the FTCA. *See Lambert v. United States*, 198 F. App'x 835, 840 (11th Cir. 2006); *Roszycka v. Whitehead*, No. DKC-09-3210, 2010 WL 2925054, at *3 n.2 (D. Md. July 21, 2010); *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 367 (E.D.N.Y. 2005) (citing cases).

Under the PLRA, exhaustion may only be excused if the administrative procedure is not actually available. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). An administrative procedure is not available when prison officials are "unable or consistently unwilling to provide any relief to aggrieved inmates" such that it effectively "operates as a simple dead end"; the procedure is so "opaque" that it is practically incapable of use; or prison administrators actively thwart inmates from filing grievances. *Ross*, 136 S. Ct. at 1859-60.

A.    **Administrative Remedy Requests**

BOP records establish that Gambino has filed at least 163 Administrative Remedy Requests ("ARRs") since entering BOP custody, but he has fully exhausted only two relating to his incarceration at FCI-Cumberland: ARRs No. 818561 and No. 825113. In ARR No. 818561, filed on April 23, 2015, Gambino alleged that he was improperly denied certain medication and reasonable accommodations in the form of a cane and shoes. The final response was issued on November 9, 2015. In ARR No. 825113, filed on June 8, 2015, Gambino alleged that he received improper dental treatment. The final response was issued on November 13, 2015. Since filing the present civil actions, between January and April 2018, Gambino filed multiple ARRs requesting

11

that "all remedies be considered exhausted." Williams Decl. ¶ 12, Mot. Dismiss Ex. 1, ECF No. 72-2. Those requests were rejected.

Although Gambino asserts in his Complaint that he "exhausted what remedies were truly available" and alleges the "mis-using" of the grievance process "to cause denials and/or rejections unfairly," he has not provided a sufficient basis to conclude that the administrative process was actually unavailable to him. Compl. at 8-9. In a predecessor case, the Court examined and rejected the argument that the ARR process at FCI-Cumberland was effectively unavailable to Gambino. *See Gambino v. Moubarek*, No. TDC-15-2202, 2016 WL 1644360, at *4-5 (D. Md. Apr. 21, 2016). Moreover, Gambino's record of filing numerous ARRs, several of which have been fully exhausted, belies his claim that the process is either a dead end or that prison officials actively thwart the filing and pursuing of ARRs. *See Ross*, 136 S. Ct. at 1859-60. He has neither claimed nor established that the Administrative Remedy Program is so opaque that it is practically incapable of use.

Accordingly, the record establishes that Gambino failed to fully exhaust administrative remedies on the following claims: the Eighth Amendment claims relating to alleged excessive force in stopping Gambino's suicide attempts; the First Amendment claims for retaliation based on allegedly inducing suicide attempts and engaging in threats of or actual sexual contact; the First Amendment claims for retaliation and denial of access to the courts based on destruction of legal materials or release of personal information; and the Privacy Act claims. Because the First Amendment claims will be dismissed for failure to exhaust administrative remedies, the Court need not address whether a First Amendment claim may proceed pursuant to *Bivens*.

**B.      FTCA Claims**

For a tort claim under the FTCA, a prisoner must first exhaust the administrative process

established under the FTCA, consisting of (1) presenting the relevant federal agency with a claim

describing, with particularity, the alleged injury and damages; and (2) either receiving a written

denial of the claim from the agency or waiting six months from the date of filing without obtaining

a final agency disposition. *See* 28 U.S.C. § 2675(a).  For a federal prisoner's FTCA claim, courts

need consider only this specific FTCA exhaustion requirement, not the separate BOP procedures

adopted pursuant to the PLRA.  *See Lambert*, 198 F. App'x at 838, 840 (considering a prisoner's

administrative exhausted FTCA claim even though the BOP's administrative procedures were not

exhausted); *Sanchez-Mercedes v. Bureau of Prisons*, 453 F. Supp. 3d 404, 423 n.11 (D.D.C. 2020);

*see also Bakhtiari v. Spaulding*, 779 F. App'x 129, 132 (3d Cir. 2019) (for a prisoner's FTCA

claim, considering only the FTCA administrative exhaustion requirements).  Gambino has filed 16

administrative tort claims while in BOP custody, only four of which arise from Gambino's

incarceration at FCI-Cumberland.  Two of these claims, Administrative Tort Claim Nos. TRT-

MXR-2017-03794 and TRT-MXR-2017-03519, both received on March 24, 2017 and denied on

May 3, 2017, related to claims of medical and dental malpractice at FCI-Cumberland, such that

any FTCA claims arising from those filings or other FTCA claims asserting health care malpractice

were dismissed when the Court ruled on the First Motion.  *See Gambino*, 2019 WL 1300856, at

\*7-8.  Thus, only the two administrative tort claims identifying non-medical FTCA claims have

been administratively exhausted and may support tort claims in this case.

In Administrative Tort Claim No. TRT-MXR-2017-00495, received on October 25, 2016,

Gambino alleged tort claims relating to his placement on suicide watch at FCI-Cumberland,

specifically that on February 16, 2016, correctional officers gave him bed sheets and watched as

he attempted to commit suicide by hanging, then saved him from doing so, only to use excessive force on his arm and wrist afterwards.  This claim was administratively denied on January 6, 2017. In Administrative Tort Claim No. TRT-MXR-2017-00493, also received on October 25, 2016, Gambino alleged that between February 2 and March 18, 2016, Lt. Eirich threatened him with rape, and that FCI-Cumberland officials removed a package with legal materials relating to several of his active federal court cases.  This claim did not include an allegation of sexual touching by Lt. Eirich or anyone else.  This claim was administratively denied on February 24, 2017.

Accordingly, the Court finds that Gambino has exhausted administrative remedies relating to his FTCA claims relating to the alleged facilitation of his suicide attempts and the use of excessive force in preventing them, the alleged threat of rape, and the alleged removal of his legal materials, as set forth in the two fully exhausted FTCA administrative complaints.  All other FTCA claims will be dismissed for failure to exhaust the administrative process.

## VI.    Eighth Amendment

Gambino's remaining Eighth Amendment claims are based on his allegations that he was denied constitutionally adequate medical, dental, and mental health care at FCI-Cumberland.  As he was a federal prisoner, he asserts these claims pursuant to *Bivens*.  *See Carlson v. Green*, 446 U.S. 14, 16 n.1, 23 (1980) (applying *Bivens* to an Eighth Amendment claim for failure to provide adequate treatment for a prisoner's medical condition).

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII. An inmate's Eighth Amendment rights are violated when there is "deliberate indifference" to "serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  A deliberate indifference claim has both objective and subjective component.  The plaintiff must have an objectively serious medical condition, consisting of "one

14

that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson,* 775 F.3d at 178 (quoting *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008)).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1978)). "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer,* 511 U.S. at 835). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.*

An Eighth Amendment deliberate indifference claim may be based on inadequate mental health care. *See DePaola v. Clarke,* 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims."); *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (stating that there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart"). Likewise, an Eighth Amendment claim may be based on inadequate dental care. *See King v. United States,* 536 F. App'x 358, 362 (4th Cir. 2013); *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir. 1989)

("Dental care is one of the most important medical needs of inmates." (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980))).

### A.    Medical Care

Separate from his claims of inadequate mental health treatment, Gambino has alleged constitutionally inadequate medical care relating to spinal or back pain, a fungal infection, a stomach condition, and his hunger strike. Gambino's medical records and declarations from his medical providers establish that he received treatment for these conditions and was not subjected to deliberate indifference to his medical needs.

On Gambino's back pain, during a medical visit on March 4, 2015, Gambino reported ongoing and past back pain. Initially, he was prescribed a pain reliever and at some point received a back brace. On April 21, 2015, Gambino again reported back pain, this time referencing a spinal deformity and noting that at times he has involuntarily defecated as a result of his back pain. The examining nurse determined that he did not appear to be in acute distress and was able to walk without difficulty. During a May 1, 2015 examination, he was found to have a full range of motion to the lumbar spine. Nevertheless, he was prescribed Naproxen for pain and x-rays were ordered, which revealed mild degenerative disc disease. He was seen again on June 11, 2015, June 17, 2015, and July 2, 2015 about his back issues and was told that the x-rays revealed that the best course of treatment was to rely on pain relievers. After further complaints, he was offered a neck brace on July 22, 2015 but declined it. On July 27, 2015, he received another set of x-rays. On August 5, 2015, Gambino requested a cane, and he has submitted declarations from various inmates attesting to his need for one. The medical providers, however, did not observe a physical need for a cane at the time of their examinations of Gambino, and he was later observed walking without difficulty on August 9. Although Gambino was instructed to follow up at sick call if his

16

conditioned worsened, he did not return until November 19, 2015,  After a February 19, 2016 visit, another set of x-rays of his cervical spine was taken on February 24, 2016, with negative results.

As for the fungal infection, Gambino reported the condition on June 11, 2015 and was prescribed an oral anti-fungal medication to treat the condition.  Gambino did not complain about the condition again until January 26, 2016, when he acknowledged that the June 2015 symptoms had resolved but reported a new or renewed rash.  This rash was not particularly visible, but the same medication was prescribed.  At the time of a follow-up visit on February 29, 2016, the condition had resolved.

On March 4, 2015, Gambino reported stomach issues consistent with gastroesophageal reflux disease.  He was provided a seven-day supply of the medication Prilosec and instructed to obtain additional doses through the commissary if needed.  He was told that, by policy, he could receive a prescription for Prilosec only if he had a specific test which showed that he had reflux or peptic ulcer disease.  On June 11, 2015, Gambino returned and reported vomiting because of stomach acid.  Though he claimed that he could not afford to buy Prilosec at the commissary, medical staff determined that he had sufficient funds in his account.  Medical staff then ordered a test to determine whether he had H. Pylori bacteria in his stomach, which would reflect an infection that could lead to the same symptoms.  The test results were negative.  Gambino did not report reflux again.

Finally, when Gambino conducted a hunger strike from June 14, 2015 to June 18, 2015 to protest his medical care for these issues, medical staff provided him care pursuant to the BOP's hunger strike policy, which consisted of daily medical assessments, offering drinks every two hours and meals daily, and monitoring his water intake.  During these visits, Gambino did not

17

show signs of dehydration or distress. Although Gambino has submitted declarations from inmates stating that prison officials turned off the water to Gambino's cell during his hunger strike, Defendant Dr. Mohammed Moubarek, the Clinical Director at FCI-Cumberland, has stated that such a step is a standard procedure during a hunger strike to allow prison officials to monitor the prisoner's water intake in a precise way.

The record shows that Gambino received consistent medical attention for his conditions and that prison medical staff did not deliberately fail to provide treatment or act with reckless disregard to his serious medical needs. He received pain relievers, several rounds of x-rays, and an offer of a neck brace for his back condition; prescription medication for his fungal infection; medication for his gastrointestinal symptoms and a diagnostic test for that condition; and daily monitoring during his hunger strike. Although Gambino may disagree with decisions about the medication prescribed to treat him and the assistive devices he was provided, disagreements between an inmate and a medical provider are insufficient to demonstrate deliberate indifference. *See Jackson*, 775 F.3d at 178; *Russell v Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). Accordingly, the Court will grant the Motion on the Eighth Amendment claims relating to medical care.

### B.    Dental Care

Gambino's Eighth Amendment claim relating to inadequate dental care is based on the treatment of an allegedly infected wisdom tooth in 2015. Medical records and a declaration submitted by Defendant Dr. Tequilla McGahee, a dentist, reveal that she first examined Gambino on April 21, 2015 for a complaint that his wisdom tooth was infected and, after reviewing dental x-rays, diagnosed him as having a partially impacted wisdom tooth with intermittent gingival irritation and inflammation, without signs of infection. McGahee advised Gambino that extracting

the tooth would be the safest course to prevent infection. Gambino, however, declined extraction for religious reasons. Dr. McGahee irrigated the area, observed no foreign bodies or debris, and informed him that based on the position of the tooth and the partial impaction, it was likely to become symptomatic again. She instructed him to use sick call in the event of pain and advised that he could receive irrigation or cleaning of the area through sick call as needed.

On April 22, 2015, Gambino returned to the dental clinic to show the dentist that he had what he believed to be pus coming from the area around his wisdom tooth. Dr. McGahee found that when she pressed on the soft tissue around the tooth, a secreted liquid emerged. Dr. McGahee explained to Gambino that because the tooth was partially impacted, such a secretion would continue to occur if he did not have the tooth extracted. Dr. McGahee informed Gambino that if did not agree to extraction, he should return to sick call whenever he needed the area irrigated and cleaned. Although Gambino asked to be put on a regular schedule of two cleanings per year, Dr. McGahee declined to do so because such a schedule was not medically necessary, as his needs could be met by irrigation and cleaning on an as-needed basis. At Dr. McGahee's request, Gambino reviewed a medical form advising him that failure to extract the tooth could lead to increased pain, swelling, decay, and possibly infection, and he signed it acknowledging that he was declining the extraction.

On October 29, 2015, Gambino returned to Dr. McGahee for a periodontal evaluation, including a review of dental x-rays, and was assessed as periodontally stable. When Gambino again declined extraction of his wisdom tooth, McGahee sought a second opinion from the Chairman of the Oral and Maxillofacial Pathology Department at the Naval Postgraduate Dental School, who recommended extraction of the tooth. Gambino did not report for additional dental treatment before he left FCI-Cumberland in March 2016.

19

The record reflects that Dr. McGahee gave timely attention to Gambino's wisdom tooth and recommended a course of treatment, specifically, extraction. When Gambino's declined that treatment, she offered the alternative of regular irrigation and cleaning on an as-needed basis, and she informed Gambino that such treatment would not completely address the problem. Particularly where another dentist concurred in her diagnosis and proposed course of treatment, the record does not support a finding that she acted with deliberate indifference to Gambino's dental needs. At most, Gambino's dissatisfaction with Dr. McGahee's recommendation and treatment reflects a disagreement with the medical provider over the course of treatment, which does not establish deliberate indifference. *See Jackson,* 775 F.3d at 178; *Stokes v. Hurdle,* 393 F. Supp. 757, 762 (D. Md. 1975) (holding that a difference of opinion on dental care did not support an Eighth Amendment violation because "even if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention"), *aff'd,* 535 F.2d 1250 (4th Cir. 1976). The fact that Dr. McGahee declined to provide a regular, six-month cleaning schedule and instead offered irrigation and cleaning of the wisdom tooth area on an as-needed basis does not establish deliberate indifference, as the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring,* 551 F.2d at 47–48; *see also King v. United States,* 536 F. App'x 358, 362-64 (4th. Cir. 2013) (finding that under the circumstances, the failure to perform a root canal on a prisoner did not constitute deliberate indifference). The Court will therefore grant the Motion and enter summary judgment in favor of Defendants on Gambino's Eighth Amendment claim relating to allegedly inadequate dental care.

### C.     Mental Health Care

Gambino also alleges deliberate indifference to his mental health needs, based primarily on the prescribing of Citalopram (Celexa), a drug which he asserts produced side effects including suicidal ideations, and his assertion that mental health providers did not provide appropriate care when he took steps to attempt suicide.   Gambino's mental health records, however, reflect no deliberate indifference to Gambino's mental health needs.

In November 2015, after reporting various symptoms of depression, Gambino was prescribed Celexa, a depression medication.   Although Gambino has asserted in a declaration that by December 2015 he had strong side effects and reported them to Defendant Dr. Shane Sheetz, he does not describe the specific adverse effects he reported to Dr. Sheetz, nor is there any record reflecting such a report.   According to the medical records, as of January 26, 2016, Gambino reported to Defendant Kristi Crites, a nurse, that the medication was working well and that he had no side effects from it.   He also reported no negative effects during a February 3, 2016 visit with Dr. Moubarek.

On February 4, 2016, at a time when Gambino was scheduled to be transferred to another facility, Gambino attended a Psychology Services open house at FCI-Cumberland and gave the staff psychologist a bed sheet tied into a noose and written materials reflecting suicidal ideations. Based on that communication, mental health providers initiated a Suicide Risk Assessment ("SRA").   Gambino did not cooperate with the SRA and was then placed on suicide watch during which he remained in a Special Housing Unit observation cell with constant observation and daily visits and care from mental health providers, including Dr. Hershberger, Dr. Sheetz, and Defendant Dr. Brett Dodd.   Though he would not engage with mental health staff, Gambino made no attempts to harm himself during this time period.

On February 16, 2016, Dr. Hershberger, the Chief Psychologist, determined that it was safe to remove Gambino from suicide watch, based on his lack of attempts to harm himself, Gambino's recent communications with his family that did not exhibit suicidal ideations, and the assessment that Gambino may have been attempting to thwart his transfer to another facility. When he was released from suicide watch and was returned to a regular cell, Gambino loosely tied a bed sheet around his neck, threw it over a pipe in his cell, and stood in place until correctional staff arrived. In the estimation of Dr. Hershberger, this action was aimed at evoking a response rather than engaging in an actual suicide attempt, so he did not return Gambino to suicide watch and instead placed him a double cell. Later that day, however, Gambino again wrapped a sheet around his neck and this time began to tighten it by hand. Gambino was removed from his cell and escorted to the medical unit where Dr. Hershberger attempted to engage him in discussion. Gambino refused to communicate. Though Dr. Hershberger continued to assess these actions to be non-lethal and intended to evoke a response, he directed that Gambino be returned to suicide watch.

Once back on suicide watch, Gambino continued to be assessed and evaluated by mental health providers. This period was extended because on several occasions, he stated that if removed from suicide watch he would attempt to kill himself. Nevertheless, he was removed from suicide watch on February 29, 2016 after Dr. Hershberger assessed that he was no longer expressing active suicidal intent, and a Suicide Risk Management Plan had been completed for Gambino.

The record of Gambino's mental health care reflects insufficient evidence to support a claim of deliberate indifference to his mental health needs. When Gambino described symptoms of depression in November 2015, he was prescribed Celexa to treat it. Although Gambino claims that the medication caused side effects that increased his suicide risk, there is no medical record reflecting such a report prior to the events of February 2016. At that point, when Gambino

22

expressed suicidal ideations and engaged in two actions that were either actual suicide attempts or, as determined by Dr. Hershberger, attempts to elicit a response, the mental health providers placed him on suicide watch, monitored him regularly, and successfully prevented him from harming himself. Thus, even if Celexa caused adverse side effects that were not immediately addressed, these reasonable responses are inconsistent with deliberate indifference. *See Farmer*, 511 U.S. at 537. To the extent that Gambino claims that they placed him on suicide watch for too long, or that they did not act swiftly enough to prevent his apparent attempts, the decisions on his care were based on Dr. Hershberger's professional assessment of the risk, and Gambino's disagreement on such issues of medical judgment does not support a claim of deliberate indifference. *See Scinto*, 841 F.3d at 225. The Court will therefore grant the Motion as to the Eighth Amendment claims of deliberate indifference to Gambino's mental health needs.

## VII. FTCA Claims

As discussed above, with all FTCA tort claims based on medical malpractice previously dismissed, *Gambino*, 2019 WL 1300856, at *7-8, the remaining FTCA tort claims are those for battery or intentional infliction of emotional distress arising out of: (1) correctional officers' alleged inducement of his suicide attempts by providing him with bed sheets and delaying their intervention; (2) the use of excessive force on his arm when they intervened to stop any suicide attempt; (3) Lt. Eirich's verbal threat of rape; and (4) the removal or destruction of his legal materials. An FTCA claim is directed only against the United States, not the federal employee whose act or omission gave rise to the claim. 28 U.S.C. § 2679(d)(1).

### A. Suicide Attempts

Gambino alleges that on February 16, 2016, after he was released from suicide watch, he was escorted by six unidentified correctional officers to his regular cell, given bed sheets, and

allowed to attempt suicide by making a noose with the sheet on two separate occasions. On both occasions, the correctional officers intervened to prevent Gambino from harming himself. Gambino further alleges that in stopping his apparent suicide attempts, the correctional officers used excessive force by using an arm restraint, twisting his right arm, and attempting to break his arm, wrist, and possibly his shoulder.

Construed liberally, the torts asserted by Gambino consist of battery and intentional infliction of emotional distress. Under Maryland law, a battery is an intentional "harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099-1100 (Md. 1999). A claim of intentional infliction of emotional distress requires a showing that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 465-66 (D. Md. 2002). Such a claim is "rarely viable," *Arbabi*, 205 F. Supp. 2d at 466, and is reserved for "those wounds that are truly severe and incapable of healing themselves," *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991).

First, on the claim that correctional officers effectively caused his suicide attempts with the intent to cause emotional distress, as discussed above, Dr. Hershberger, applying his medical judgment, approved the release of Gambino from suicide watch to a regular cell presumably with the understanding that he would have bed sheets. Thus, the provision of sheets was appropriate. Although Gambino claims that FCI-Cumberland personnel provided him with the sheets with the intent to induce him to attempt suicide, he has offered no evidence, such as a statement by a correctional officer reflecting such intent, to support this speculative claim. Indeed, as he acknowledges, correctional officers twice intervened to stop his attempts in ample time, and, based

24

on the loose tying of the sheet and the failure to secure one end, Dr. Hershberger considered Gambino's actions to be aimed at evoking a reaction rather than actual lethal attempts. Significantly, in the video of the aftermath of these incidents, which shows correctional officers escorting Gambino to and from a medical examination, and medical providers assessing his condition, there is no sign of any animosity toward Gambino and no sign of any intent or interest in causing him harm. On this record, there is insufficient evidence to support a claim that the correctional officers intentionally induced suicide attempts.

Moreover, under the FTCA, "No person convicted of a felony who is incarcerated . . . while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 28 U.S.C. § 1346(b)(2). Although Gambino was examined by medical providers after the incident, both the medical records and the video show no sign of any injury to his neck, and Gambino did not report any such injury. Thus, this claim also fails because of the lack of any physical injury arising from Defendants' alleged effort to induce the suicide attempt and failure to intervene immediately.

As for the claim of battery based on excessive force in stopping any suicide attempt, the record evidence does not support this claim. Where Gambino has acknowledged that he was engaged in a suicide attempt, the correctional officers were authorized to use some force to stop his attempt. *See Ashton v. Brown*, 660 A.2d 447, 471 n.24 (Md. 2004) (noting that if the officer's act itself was not tortious, then neither was the physical force used to effectuate them). Thus, a claim of battery would require a showing that the correctional officers' actions were excessive as compared to the amount of force needed to prevent the suicide. *See Williams v. Prince George's Cty.*, 685 A.2d 884, 898 (Md. 1996). Notably, however, there was no evidence identified on the

day of the suicide attempts of any injury to Gambino's shoulder, arm, or wrist. After those incidents, medical providers examined him and saw no sign of an injury, and when asked, Gambino denied having any pain or discomfort. Moreover, the video of the aftermath, in which correctional officers and medical providers assessed Gambino before escorting him back to a cell, shows no sign of an injury to his right arm area as a result of the force used to stop any suicide attempt. "[W]hen a video quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury would believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 378 (2007)). Although Gambino reported shoulder pain three days later, when examined, he had a full range of motion. Under these circumstances, this claim fails both because there is insufficient evidence of a physical injury, *see* 28 U.S.C. § 1346(b), and because in light of such a lack of such evidence, there is insufficient evidence to create a genuine issue of material fact on whether Defendants used an unauthorized level of force in intervening to stop Gambino's suicide attempt. The Court will therefore grant the Motion on the FTCA claims relating to the suicide attempts.

### B.    Verbal Threats

Gambino also asserts tort claims based on his allegation that at some point while he was on suicide watch, Lt. Eirich threatened him with rape. According to Gambino's medical records, Gambino reported on February 19, 2016 that about one week earlier, he had been verbally harassed by a correctional officer, presumably Lt. Eirich, with the statements that he would be raped at the facility to which he was scheduled to be transferred and that the correctional officer would ensure that it happened, and that the same correctional officer later entered his cell and touched the crack between his buttocks.

The claim of verbal harassment fails because, as alleged, Gambino's claim is one for "mental or emotional injury," but Gambino has neither alleged nor provided evidence of any "physical injury" associated with that threat. 28 U.S.C. § 1346(b). As discussed above, only the verbal threat of rape was referenced in Gambino's administrative tort claim, so the claim related to the unwanted touching has been dismissed for failure to exhaust administrative remedies. Even if the unwanted touching claim were exhausted, it would likewise fail because the described touching does not constitute a "physical injury or the commission of a sexual act (as defined in section 2246 of title 18)" as required to permit a federal prisoner's tort claim. 28 U.S.C. § 1346(b); 18 U.S.C. § 2246(2) (2018) (defining "sexual act"). Defendants are thus entitled to summary judgment on this claim.

## C.    Legal Materials

Finally, Gambino asserts a tort claim relating to the loss of some of his legal materials when he was transferred from FCI-Cumberland to FCI-Fort Dix. On March 31, 2016, Gambino signed an Inmate Personal Property Record at FCI-Fort Dix stating that he had received a box of legal materials. Although Gambino maintains that the box did not contain all of his legal materials, Gambino's claim for the loss of his property fails because the FTCA excludes from the Government's waiver of sovereign immunity "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer." 28 U.S.C. § 2680(c). The Supreme Court has interpreted this provision as precluding a federal inmate's FTCA claim against BOP officials for a loss of personal property while in prison, including during a transfer to another facility. *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 217-18, 228 (2008). Accordingly, the Court will grant the Motion as to this claim.

27

**CONCLUSION**

For the foregoing reasons, Defendants' Second Motion to Dismiss the Complaint, or in the

Alternative, for Summary Judgment will be granted. A separate Order shall issue.


Date:  January 28, 2021

THEODORE D. CHUANG
United States District Judge

28